## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

CIVIL ACTION NUMBER:

MAHAMET CAMARA, MOUSSA DEMBELE, ANDRE DE OLIVEIRA, BEMBA DIALLO, SALIF DIALLO, MACIRE DIARRA, DOMINIQUE DICKERSON, ERNIE DUKE, MOHAMED KABA, DEAN PATRICELLI, and ERNEST WILLIAMS, individuals,

Plaintiffs,

v.

MATHESON TRUCKING, INC., a California corporation, MATHESON FLIGHT EXTENDERS, INC., a California corporation, and MARK MATHESON, an individual,

Defendants.

---

### COMPLAINT

---

Mahamet Camara, Moussa Dembele, Andre De Oliveira, Bemba Diallo, Salif Diallo, Macire Diarra, Dominique Dickerson, Ernie Duke, Mohamed Kaba, Dean Patricelli, and Ernest Williams (collectively, "Plaintiffs"), by their undersigned attorneys, state as follows for their Complaint against Matheson Trucking, Inc., Matheson Flight Extenders, Inc., and Mark Matheson (collectively, "Defendants"):

### JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1337.

2.      This action arises under the Civil Rights Act of 1866, as amended, 42 U.S.C. §§ 1981 and 1981a. More specifically, this action arises from the conduct of Defendants in:

      a.  Discriminating against black employees and a black applicant (including all Plaintiffs except Dean Patricelli) with respect to virtually all terms and

1

conditions of employment, including but not limited to: hiring, termination, constructive discharge, promotion, furlough, recall, hours, vacation pay, benefits, hourly wage, work shifts, support and assistance, discipline, job assignment, work days, work environment, holiday pay, layoffs, check-in times, length of breaks, and overtime pay;

b. Discriminating against black employees and black African employees by and creating a hostile work environment for black employees consisting of, but not limited to, racial epithets, insults, pervasive disrespect and disregard, and hostile and discriminatory treatment; and

c. Retaliating against all Plaintiffs who continued to be employed after filing Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC Charges" or "EEOC Charges of Discrimination") and/or provided affidavits in support of those Charges. This retaliation has included, but has not been limited to, terminating the employment of most Plaintiffs because of their activity before the EEOC.

3.      Venue is proper in this Court, because all actions complained of were carried out within the State of Colorado, and all Plaintiffs were employed by Defendants in the State of Colorado.

4.      Plaintiffs have also filed timely charges with the U.S. Equal Employment Opportunity Commission ("EEOC") and have requested Right to Sue letters from the EEOC. Upon receipt thereof, Plaintiffs will file a Motion to Amend Complaint to include claims under 42 U.S.C. 2000e, *et seq.* (Title VII).

## GENERAL ALLEGATIONS

### Parties

**Plaintiffs**

5.      Plaintiffs include ten current and former employees of Defendants, all of whom work or worked at Defendants' place of business at 6875 E 54th Place, Commerce City, Colorado 80022 (the "Denver Facility"),and one Plaintiff who applied for employment at the Denver Facility.  With the exception of one Plaintiff who was employed as a Tug Driver, the rest of the Plaintiffs employed at the Denver Facility were Mail Handlers.

6.      Five plaintiffs are black Africans from the Republic of Mali; one is a black African from Guinea; one is a black man from Brazil; three are black men born in the United States of America; and one is a white American who has been subjected to unlawful retaliation for providing truthful evidence in support of the other Plaintiffs' EEOC Charges of Discrimination.

7.      All plaintiffs are lawful residents of the United States and, at all times relevant hereto, have resided in the United States of America.

8.      Plaintiff Mahamet Camara is a black African man, originally from the Republic of Mali.  He was hired as a temporary Mail Handler at the Denver Facility in September 2010 and has been subjected to discrimination in almost all terms and conditions of employment, a furlough, and a hostile work environment, all based on his race.  He remains employed in that position.

9.      Plaintiff Moussa Dembele is a black African man, originally from the Republic of Mali.  He was hired as a temporary Mail Handler at the Denver Facility in September 2010 and was subjected to discrimination in almost all terms and conditions of employment and a hostile work environment, each based on his race.  He was terminated for manifestly pretextual reasons in

3

November 2010.

10.    Plaintiff Andre De Oliveira is a black Brazilian man, originally from the city of Brasilia.  He was hired as a Mail Handler at the Denver Facility in 2006 and has been subjected to discrimination in almost all terms and conditions of employment, a furlough, and a hostile work environment, all based on his race.  Although he remains employed, he was laid off for over half a year beginning in July 2011, approximately three months after he filed a Charge of Discrimination with the EEOC.

11.    Plaintiff Bemba Diallo is a black African man, originally from the Republic of Mali. He was employed as a mail handler at the Denver Facility between 2003 and 2005, when he resigned voluntarily.  He was rehired as a mail handler on the night shift in September 2009 and was subjected to discrimination in almost all terms and conditions of employment, a furlough, and a hostile work environment, all based on his race.  He remained a "permanent" employee until he was involuntarily terminated for pretextual reasons in July 2012, during a mediation held before a mediator employed by the Judicial Arbiter Group (JAG) in connection with the EEOC Charges of Discrimination filed by Plaintiffs.

12.    Plaintiff Salif Diallo is a black African man, originally from the Republic of Mali. He was hired as a temporary Mail Handler at the Denver Facility in September 2010 and has been subjected to discrimination in almost all terms and conditions of employment, a furlough, and a hostile work environment, all based on his race.  He remains in that position.

13.    Plaintiff Macire Diarra is a black African man, originally from the Republic of Mali. He was hired as a temporary Mail Handler at the Denver Facility in September 2010 and was subjected to discrimination in almost all terms and conditions of employment, a furlough, and a

hostile work environment, all based on his race. Defendants systematically reduced his hours until he was working less than one full shift per week and then terminated his employment in July 2011, less than four months after he had filed a Charge of Discrimination with the EEOC.

14.     Dominique Dickerson is a black American man. He was hired at the Denver Facility in September 2010 as a Mail Handler and Forklift Operator and has been subjected to discrimination in almost all terms and conditions of employment, a furlough, and a hostile work environment, all based on his race. He remains in that position.

15.     Plaintiff Ernie Duke is a black American man. He was hired at the Denver Facility as a Mail Handler in 2003 and was subjected to discrimination in almost all terms and conditions of employment, a furlough, and a hostile work environment, all based on his race. He continued in that employment until Defendants involuntarily terminated him without justification in June 2011, less than three months after he filed a Charge of Discrimination with the EEOC.

16.     Plaintiff Mohamed Kaba is a black African man, originally from the Republic of Guinea. In November 2011, he applied for a vacant Mail Handler position at the Denver Facility. Following the Charges of Discrimination filed by the other Plaintiffs, Defendants refused to hire any more black Africans for the Denver Facility, and Mr. Kaba was not offered employment for this reason.

17.     Plaintiff Dean Patricelli is a white American man. He was employed at the Denver Facility from August 2010 until September 2011, when he was terminated for having supported the other Plaintiffs in prosecuting their EEOC Charges of Discrimination and submitting an Affidavit to the EEOC on their behalf.

18.     Plaintiff Earnest Williams is an African American man. He became employed at the

Denver Facility as a Tug Driver in 2001.  During the course of 2010, Defendants hired a new white employee and began systematically reducing Mr. Williams' hours, giving the work load to the new white employee.  By early January 2011, virtually all of Mr. Williams' hours and income had been eliminated, causing his constructive discharge.  At all times, Mr. Williams was a very good employee, and his performance was not an issue.

**Defendants**

19.     Defendant Matheson Trucking, Inc. ("Matheson Trucking") is a California corporation in good standing, with its principal place of business in Sacramento, California. Matheson Trucking is a privately-held corporation with nation-wide operations.  Its primary business is providing transportation-related services to the United States Postal Service and private delivery services.

20.     Defendant Matheson Flight Extenders, Inc., ("Flight Extenders") is a California corporation in good standing, with its principal place of business in Sacramento, California.  Flight Extenders is represented to the world and operated as merely one of three divisions of Matheson Trucking.  As described on Matheson's website, the purpose of the Flight Extenders division is "ground support services for the United States Postal Service and other commercial carriers across the nation."  In practice, this consists primarily of operating regional hubs to sort and load mail based on destination.

21.     Flight Extenders maintains and operates the Denver Facility at Denver International Airport.  Most of the employees at the Denver Facility are Mail Handlers (also called Material Handlers), whose primary job function is to sort mail.

22.     Matheson Trucking holds itself out to the world, including without limitation via its

internet website, as a single integrated entity consisting of three divisions, of which Flight Extenders is one. Matheson Trucking and its three "divisions," including Flight Extenders, are in fact operated as a single enterprise and entity. Matheson Trucking and Flight Extenders are under common ownership and, upon information and belief, Matheson Trucking is the sole owner of Flight Extenders. Matheson Trucking and Flight Extenders are under common financial control, and all bookkeeping, accounting and financial decisions for both companies are handled and made by common management.

23.     The labor relations of Matheson Trucking and its three divisions are centralized in Matheson Trucking. Flight Extenders has no human resources department and absolutely no human resources personnel. Rather, Matheson Trucking provides resources, EEO service, and other oversight at the Denver facility. Michael Wilbourn, a Vice President and Director of Human Resources for Matheson Trucking, who worked in Sacramento, California at Matheson Trucking headquarters under the direction of Mr. Matheson, has full human resources responsibility for Flight Extenders. Although Flight Extenders' EEO policy provides only that complaints follow the chain of command, employees may contact Mr. Wilbourn if they are "concerned about confidentiality" or "the problem involves management."

24.     Flight Extenders' Employee Handbook and other personnel policies were written and promulgated by or at the direction of Mr. Wilbourn.

25.     The centralization of labor relations is true not just generally, but specifically with respect to Plaintiffs. As directed by Flight Extenders' policies, Plaintiffs reported their allegations of discrimination and retaliation to Mr. Wilbourn. Those allegations were investigated (albeit superficially) by Mr. Wilbourn, and the response thereto was directed by Mark Matheson and

Matheson Trucking.

26.     Defendant Mark Matheson is an individual who, upon information and belief, resides in the State of California. Mr. Matheson is the majority owner, Chief Executive Officer, and President of Matheson Trucking. He also is the Chief Executive Officer and President of Flight Extenders.

27.     Mr. Matheson was personally involved in the decision to perpetuate the systematic racial discrimination and harassment at the Denver Facility. He has also been personally involved in directing the strategies that resulted in much of the retaliation against Plaintiffs.

**General Allegations**

<u>Overview</u>

28.     In 2007, Leslie Capra became Station Manager of the Denver Facility. Ms. Capra is a white American woman. Although there were racist comments, harassment, and discrimination in the Denver Facility before Ms. Capra was Station Manager, with her active participation, support, and encouragement once she became Station Manager, such harassment and discrimination became endemic.

29.     In September 2010, a supervisor hired between 15 and 20 temporary Mail Handlers, including a number of the black employees, at the Denver facility. Ms. Capra did not approve of these hires and did not welcome the increased number of blacks in the workplace. After these hires, Ms. Capra became more openly hostile towards black employees, encouraging the supervisors and Leads under her management to do likewise.

30.     Under Ms. Capra's management, black employees were discriminated against with respect to almost every aspect of their employment, including racist and demeaning comments,

segregated job categories, discriminatory work assignments and promotion, discrimination in pay, benefits and work hours, discriminatory discipline, lack of assistance and support, and discrimination in layoffs and terminations.

31.     Flight Extenders has never had human resources or EEO personnel available at the Denver Facility.

32.     Flight Extenders provided its managers no EEO training, and its written EEO policy, promulgated by Matheson Trucking, was skeletal and inadequate.   The only supervisor of EEO practices at the Denver facility was Michael Wilbourn.

33.     Although Flight Extenders and Matheson Trucking were federal contractors, and accordingly subject to contractual obligations to observe federal law barring employment discrimination, they had no affirmative action plan and only the most minimal EEOC policies and procedures.

**Racist Comments**

34.     At the Denver Facility, Plaintiffs and many other non-white employees were subjected to continuous racist comments and insults by supervisors and co-workers alike. Complaints to supervisors and management were ignored.

35.     Black employees were regularly referred to as "niggers," "stupid Africans," and "lazy stupid Africans."

36.     A few examples of the type of endemic pervasive racist comments that were permitted at Matheson include:

> a.   Richard Townbridge, a Lead, told Bemba Diallo, "do your work, you lazy, stupid
>
> African." Mr. B. Diallo reported this incident to Ms. Capra and to the Night Shift

Supervisor, Shawn Taylor, but no action was taken.

b. Co-worker Bruce Rabe called Macire Diarra a "stupid African" and repeatedly swore at him. Although this conduct was reported, no action was taken against Mr. Rabe. Instead, he was promoted to Lead.

c. Co-worker Josh Reep yelled that he ought to "bring a gun to shoot all the niggers" and threw a metal door. Supervisor Shawn Taylor overheard this incident; yet, he refused to take any corrective action.

d. Josh Reep called Salif Diallo a "stupid idiot" and Bemba Diallo a "Stupid Nigger." Some of these incidents were reported to management. Mr. Reep has since been offered a promotion to a Lead position.

e. Co-worker Jeff Hohner called Bemba Diallo a "stupid African," "stupid African nigger," and yelled at him, in front of others, to "go back to your fucking country." Mr. B. Diallo reported this incident to Station Manager Leslie Capra, Supervisor Shawn Taylor, and a Lead, but no action was taken.

f. Supervisor Shawn Taylor told a Lead, "African people are stupid" in the presence of Mahamet Camara.

g. Co-worker Amy Hodges, a friend of Leslie Capra's who received preferential treatment, referred to a relatively fair-skinned African American employee as a "Wanna-be nigger." When an Hispanic employee who was present objected, Ms. Hodges responded, "I don't like niggers or working around niggers. The only niggers I do work around are niggers that do as I tell them."

h. After Plaintiff Dean Patricelli supported the other Plaintiffs before the EEOC,

Ms. Hodges accused him of being "on the niggers' side" and began harassing him repeatedly, provoking frequent laughter on the part of other white employees. Mr. Patricelli reported this conduct to Ms. Capra and Mr. Taylor, but no action was taken.

i. Ms. Hodges also told Mr. Patricelli, in reference to the EEOC Charges of Discrimination, "I hope the niggers get nothing. I don't understand why they can work in this country."

j. Ms. Hodges called Bemba Diallo a "nigger," and told him that she "can't talk to Africans like you."

k. On another occasion, Mr. Taylor told Ms. Hodges he had to fire some people. Ms. Hodges replied by pounding the table and yelling "they need to fire all the niggers here."

l. On occasions that Bemba Diallo and Cresencio Sanchez, an Hispanic employee, worked together, a number of employees referred to them as "that fucking nigger and wetback." This included Lead Jeremy Doudna.

m. Lead Jeremy Doudna often was rude and insulting to the black Plaintiffs generally, such as calling them "stupid" or yelling at them to work faster when white employees were not working at all.

n. Lead Gary Martin made insulting comments to black employees. For example, during an informal break, he ignored idle white employees and approached a group of idle black employees, and loudly asked them, "why are you just sitting there on your African asses?", and instructed them to go help on the dock.

37.     White employees were not subjected to similar insults and comments, whether by co-workers, Leads, Supervisors, or the Station Manager.

**Segregated Job Categories**

38.     All African and many black employees on the night shift were segregated.  White Mail Handlers would be directed to stations on one sort line, and all black Mail Handlers to stations on the other.

39.     This segregation was reinforced in various informal ways.  For example, if a black employee finished the work at his station and went to assist at a station where a white employee was still working, the white employee would simply walk away, leaving the black employee to finish that station alone.  The rare white employee who moved to assist on the "black" line would be taunted by the other white employees and otherwise pressured to immediately stop.  For example, Plaintiff Dean Patricelli was repeatedly called such things as "Bemba's boy" and a "member of the tribe" when he would assist on the "black" line.

40.     Throughout much of the relevant time period, the day shift at the Denver Facility was reserved almost exclusively for white employees.  More senior black employees who requested the day shift were kept on the night shift, while less senior white employees were placed on the day shift.

**Discriminatory Demotions and Work Assignments**

41.     In the last five years, no black employees at the Denver facility were promoted to any Lead positions despite that fact that in many instances, black employees passed over for promotion were more qualified and had more seniority and better performance evaluations than white employees who were promoted.

42.     A similar pattern of discrimination emerged when the Denver Facility received a

"Truck Hub" contract late in 2010. This resulted in the creation of several new day-shift positions that paid a higher hourly rate and provided more hours than the normal Mail Handler shifts, and yet were less strenuous. Only white Mail Handlers were informed of the opportunity and invited to apply.

43.     Driver positions at the Denver Facility are more desirable than Mail Handler positions, because the work is less physically demanding and the pay is higher. Black employees who requested a driver position would be told that the Denver Facility did not need any additional drivers at that time, even when the Denver Facility was still hiring drivers.

44.     Similarly, white temporary Mail Handlers were promoted to permanent status far more quickly than blacks, without regard to performance. While numerous white temporary Mail Handlers hired in September 2010 were promoted within a few months, no black temporary Mail Handlers were promoted to permanent positions that quickly.

45.     During each shift, one or more Mail Handlers were assigned to work the dock. In the past, most employees preferred the dock assignment, viewing the work as easier, but the dock assignments were given almost exclusively to white employees.

**Discrimination in Pay, Benefits, and Work Hours**

46.     Plaintiffs were discriminated against with respect to pay. For example, Plaintiff Dominique Dickerson often worked as a Mail Handler but was paid as a Forklift Operator, at a wage over $3/hour lower than the Mail Handler wage. No white employees were treated similarly. Even when white employees worked as Forklift Operators, they were typically paid the higher Mail Handler wage.

47.     Pay discrimination at the Denver Facility also occurred in other indirect ways,

including:

    a. Many Mail Handlers at the Denver Facility like to work holidays. This is because they receive double pay, yet the workload is lighter. Any time both a white and a black Mail Handler desired certain holiday work, Defendants selected a white Mail Handler to work on the holiday. This was true even if the white employee was less senior and even if the holiday fell on a day the black employee normally would be scheduled to work.

    b. When work slowed significantly and some employees were released before the end of their scheduled shift, Defendants almost always selected black employees first.

    c. More generally, Defendants gave black employees fewer work hours and denied black employees opportunities to earn overtime pay, and occasionally failed or refused to pay them overtime pay they had earned.

**Miscellaneous Discriminatory Hostile Treatment**

48. Black employees were isolated and often treated as less than human. For example, Station Manager Leslie Capra would not speak directly to Plaintiffs except to berate them. Ms. Capra and a number of other supervisors routinely ignored and refused to answer questions and other requests by black employees.

49. Black employees were disciplined and threatened with the police by supervisors for conduct that was accepted from white employees.

50. When work allowed, white employees were routinely permitted to take breaks longer than the officially permitted thirty minutes. Under the same circumstances, black employees were

routinely reprimanded and forced immediately to return to work.

51.     White employees were given administrative support with workers' compensation claims and other requests for assistance, which support was often denied black employees.

52.     White employees, with the knowledge of management, refused to assist black employees with their work. As one example, Nick Morris, a relatively young, white Tug Driver, regularly received assistance from other white employees in moving tugs, which are extremely heavy.   These same white employees watched Plaintiff Earnest Williams, who was then approximately seventy years old, struggle to move tugs without ever providing assistance.

**Discriminatory Hiring Practices**

53.     After the Plaintiffs filed the EEOC Charges, the Defendants gave preferential treatment to two black employees who agreed to assist Defendants in their dispute and potential litigation against Plaintiffs.   In addition, for the same reason, Defendants transferred a black employee to the Denver Facility as Station Manager.

54.     At the same time, Defendants refused to hire any new black African employees who might be friendly with any of the Plaintiffs.

55.     In October 2011, the Denver Facility had several openings for new Mail Handlers when Plaintiff Mohamed Kaba applied, in person and in writing, for a position as a Mail Handler.

56.     Supervisor Shawn Taylor told Mr. Kaba that he was a strong applicant. Mr. Taylor told Bemba Diallo that he wanted to hire Mr. Kaba, but needed to wait for approval from the "corporate office." The corporate office refused to approve the hire of Mr. Kaba because he is a black African. Defendants never expressly rejected Mr. Kaba's application, but simply ignored it until it had expired according to their policies.

57.    At the time of his application, Mr. Kaba was working in security at Denver International Airport, and he was fully qualified for the position. Instead, Defendants hired other, less qualified white employees.

**Discriminatory Furloughs, Layoffs, and Terminations**

58.    Defendants terminated a number of black employees who were good performers and replaced them with white employees when they became available. In December 2010, they also conducted a massive lay-off, targeting only their black employees.

59.    In or about September 2010, Defendants hired a white Tug Driver for the Denver Facility. They immediately began targeting their only black Tug Driver, Plaintiff Earnest Williams, one of their most senior and oldest employees.

60.    Mr. Williams was a good employee and at no time was his work performance at issue. Nonetheless, Defendants began reducing Mr. Williams' hours, until most of his hours had been eliminated. Supervisor Shawn Taylor admitted to Mr. Williams that Defendants were doing this to try and make him quit his job. The effort succeeded, and with most of his income already eliminated, Mr. Williams was constructively discharged in January 2011.

61.    Likewise, Defendants terminated Moussa Dembele immediately after hiring two white employees as Mail Handlers. Defendants targeted Plaintiff Moussa Dembele for termination despite the fact that Mr. Dembele was a satisfactory employee who had never received any performance warnings. He was terminated on November 5, 2010.

62.    At the time of Mr. Dembele's termination, Station Manager Leslie Capra falsely told him he was only being "laid off." She also told him that he "might be called back before the end of the year."

63.     Shortly thereafter, the Trucking Pilot Program at the Denver Facility was suspended. Initially, all employees were told that no employees would be laid off, but rather all employees would have their hours reduced.  Instead, on December 5, 2010, a number of employees were laid off, including all the black African employees and many other black employees.  Very few, if any, white employees were selected for layoff.

64.     Black employees were selected for layoff regardless of whether their status was temporary or permanent, and even though almost none of them actually had worked on the Trucking Pilot Program.

65.     This selection was also made without regard to seniority or work performance. Defendants laid off black employees who were some of the most senior and best performing employees at Flight Extenders, such as Plaintiff Ernie Duke.

66.     The selection of black employees for layoff was deliberate and intentional.  Before the layoffs, Ms. Capra told a white Lead "not to worry," because if there had to be any layoffs, "only the Africans" would be laid off.

67.     Most of the furloughed employees were returned to work in January, when the contract was renewed.  However, several black employees had their hours reduced.  No white employees had their hours reduced.

**Defendants' Unlawful Retaliation**

68.     Various Plaintiffs made internal reports and complaints about much of the foregoing discrimination and harassment.  Defendants' persistent response was indifference and occasional hostility.

69.     For example, Bemba Diallo complained to both his Shift Lead and Ms. Capra about

being subjected to a number of racist epithets such as "stupid African nigger" by a specific co-worker. Defendants took no action against the wrongdoer, but instead forced Mr. B. Diallo to change his schedule in order not to come in regular contact with the co-worker.

70.     Ms. Capra and the Shift Leads also began retaliating against Mr. B. Diallo in a variety of more petty ways. For example, when employees report to work, a supervisor punches their time cards. Historically, when employees arrived before the exact scheduled start of their shifts, the supervisor would punch their cards a few minutes early. After Mr. B. Diallo made these initial complaints, the supervisors held his card and refused to punch it until the exact start of his shift, denying him the additional wages from the earlier start time.

71.     In December 2010, Bemba Diallo and Salif Diallo separately reported the discriminatory furloughs and other matters to Michael Wilbourn, Director of Human Resources for Matheson Trucking.

72.     Mr. Wilbourn travelled to Denver in January 2011. He met with some of the management and supervisory staff, but did not speak with any of the affected employees. No further action was taken.

73.     Plaintiffs hired their undersigned counsel who sent a formal complaint to Defendants on February 1, 2011. Defendants instituted no EEO hearing and refused to discipline or even warn any of the Defendants' employees involved in the rampant racism at the Denver Facility.

74.     Most Plaintiffs filed their initial Charges of Discrimination with the EEOC on or about March 25, 2011, with the rest following between then and October 2011. Upon information and belief, pursuant to the EEOC's normal process, Defendants received notice of the EEOC Charges shortly after they were filed.

75.     Mark Matheson, Mr. Wilbourn, and Jim Grant travelled to Denver to address the EEOC Charges. Mr. Grant is the Chief Operating Officer of each of Matheson Trucking, Flight Extenders, and the other divisions of Matheson Trucking. Mark Matheson decided not to conduct an immediate investigation regarding the EEOC Charges, and, together with Mr. Wilbourn and Mr. Grant, both of whom work under his direction, declared "they had not done anything wrong," and resolved "not to make any changes."

76.     While Defendants did transfer the Station Manager, Leslie Capra, to another position, and they brought in John Handy, a black man, as Station Manager, they also resolved to force more of the Plaintiffs to terminate. In June 2011, Defendants instituted a new, unreasonable bid schedule that was designed to further reduce the Plaintiffs' hours and to disrupt long-term existing work schedules, forcing the terminations of a number of the Plaintiffs. Shortly thereafter, Plaintiff Dean Patricelli, a white employee who had supported the black employees and provided evidence supporting the racist allegations of the Plaintiffs, was summarily terminated despite his excellent job performance.

77.     In June 2011, a list of shifts was posted, and all Mail Handlers were told they had to bid for a shift. None of the modified shifts worked by various Plaintiffs were included on the list. When Plaintiffs inquired of management, they were told that the Denver Facility would "try" to accommodate requests for shift modification, but, in fact, Defendants refused to do so in any way.

78.     Defendants specifically rejected Ernie Duke's request to continue working his own shift, and did not assign him any shift whatsoever at the conclusion of the bid process, even though he was the second most senior employee in the Denver Facility. Defendants told Mr. Duke he was being placed "on call," but never once was he called in to work. Approximately nine months after

Mr. Duke was terminated, his old schedule reappeared onto the bid sheet.

79.     Macire Diarra and Andre De Oliveira also had their long-standing shifts eliminated and were eventually laid off, with Mr. De Oliveira going approximately half a year without work or income from Defendants, before finally obtaining a shift that he could work.

80.     Another Plaintiff, Bemba Diallo, also had his long-standing shift eliminated.  He was only able to remain employed by changing his schedule at his primary employment, so that he could work the new shift that had been assigned to him by Defendants.  Defendants then reduced the number of hours for Mr. B. Diallo, thereby limiting his employment without justification.

81.     Defendants stripped Plaintiffs Ernie Duke, Macire Diarra, Andre De Oliveira, and Bemba Diallo of their shifts while at least four white Mail Handlers with less seniority were permitted to continue working modified shifts that had not appeared on the official bid list.  There is no valid, nondiscriminatory reason Defendants could not have similarly continued to accommodate the schedules of these Plaintiffs.

82.     Retaliation also occurred informally.  Several white employees became not just disparaging, but openly hostile.  Among the worst of these was Amy Hodges, who routinely referred to the black employees as "the tribe," stated "I hope the niggers get nothing," and opined that "they should not be allowed to work in this country."  Although many such comments were made in the presence of supervisors, no disciplinary action was taken against Amy Hodges or the other offenders.

83.     Unlike most of the white employees, Dean Patricelli refused to shun the black employees, and he continued to assist them when needed on the same basis as he did other employees.  In retaliation, Ms. Hodges began frequently and loudly derogating him, calling him a "member of the tribe" and "Bemba's boy."

84.     In June 2011, Mr. Patricelli signed an Affidavit in support of the EEOC Charges filed by the black Plaintiffs.  In his Affidavit, Mr. Patricelli detailed personal observations that supported the other Plaintiffs' claims of harassment and discrimination.

85.     In July 2011, Ms. Hodges confronted Mr. Patricelli about whether he had submitted a statement in support of the black employees.  Mr. Patricelli did not deny having done so.

86.     On August 31, 2011, Ms. Hodges announced that she was going to "get someone fired."   Shortly after that statement, Ms. Hodges made deliberately false sexual harassment accusations against Mr. Patricelli, with the specific intent of getting him fired for supporting the black employees.  Although Ms. Hodges' accusations were obviously suspect and inconsistent with statements by her boyfriend (also an employee), as pointed out by Defendants' own investigation conducted by Steven Biskup in 2012.  *See* Exhibit 1, Interview of Amy Hodges, pp. 6-8, Interview of Nick Morris, p. 5.   Nonetheless, Defendants refused to investigate and used her statements as a pretext to terminate Mr. Patricelli.

87.     After Mr. B. Diallo sent a letter to Mr. Wilbourn on November 8, 2011, complaining that discrimination and harassment were continuing in the Denver Facility, Mr. Handy refused to help Mr. B. Diallo or address Mr. B. Diallo's complaint that Josh Reep had called him a "stupid nigger" and made other disparaging comments.  Mr. Handy stated that he would not help Mr. B. Diallo until he withdrew his November 8 letter.  Mr. B. Diallo also needed proof of employment in order to adopt his nephew, but Mr. Handy refused to provide anything until Mr. B. Diallo retracted his November 8, 2011 letter.  Mr. Handy stated that if Mr. B. Diallo did not retract the November 8 letter, Handy never would do anything for him, and eventually would "fire [his] ass."

88.     Defendants' excuse to fire Mr. B. Diallo came approximately seven months later.  On

June 29, 2012, Mr. B. Diallo was assaulted in the break room by another employee, Noumady

Sissoko. Mr. Sissoko struck Mr. B. Diallo on the head with a metal thermos. Mr. B. Diallo had not

struck Mr. Sissoko and was not at fault for the incident. Nonetheless, Defendants used the incident

as a pretext and terminated both Mr. B. Diallo and Mr. Sissoko during the attempted mediation of

this case at JAG.

**Defendants' Investigation**

89.     In December 2011, almost a year after the Plaintiffs filed their initial EEOC Charges,

Defendants finally retained an outside investigator to conduct an investigation of the Plaintiffs'

discrimination claims. The Plaintiffs who were still employed were interviewed at length. The

investigation report (the "Biskup Report") is attached as Exhibit 1 and incorporated herein, and it

strongly corroborates the Plaintiffs' claims of discrimination. The investigator, Steven Biskup, an

employment attorney who has spent almost all of his career working for employers, found the

Plaintiffs' accounts of race discrimination and retaliation to be credible. Mr. Biskup also concluded

that many of Defendants' witnesses were not credible. He also found with regard to Defendants:

> [N]o meetings have been held with the employees on the graveyard shift to address the
> environment and to insist upon respectful treatment of coworkers irrespective of race and
> national origin. Management has never apologized for the blatant disrespect shown to blacks
> by Leslie Capra, the prior Station Manager. Her behavior may well have served as the model
> of poor treatment adopted by her supervisors such as Shawn Taylor, and her Leads like
> Jeremy Doudna. The company should have disavowed her poor management practices at her
> removal (no doubt she should have been fired) and pledged to start anew with fresh, vibrant
> personnel practices supportive of racial and cultural diversity, but it did not.
>
> No racial or cultural sensitivity training has been done with managers/supervisors, nor with
> the regular non-supervisory employees as to how to treat people with respect and dignity in
> the workplace. With multiple claims of discrimination, I would have thought this sort of
> intervention would have been implemented months and months ago. There has been no real
> public declaration by the company of its obligation and commitment to insure a workplace
> free of discrimination and racial harassment. The company has failed to announce that it will
> not tolerate discrimination or harassment in any form. All of the issues of discrimination and

racial harassment as brought by multiple charging parties have just been left to fester and resentments allowed to grow, it would appear.

Exhibit 1, Interview of Cresencio Sanchez, pp. 22-23.

90.     Even after Mr. Biskup's investigation, Defendants refused to take any action to remedy their discriminatory practices or to address the findings of its own EEO investigation by Mr. Biskup.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF–DISCRIMINATION: HOSTILE WORK ENVIRONMENT
(By Camara, Dembele, De Oliveira, B. Diallo, S. Diallo, Diarra, Dickerson, Duke, and Williams; Against Matheson Trucking and Flight Extenders)

91.     Plaintiffs incorporate herein all of the foregoing allegations in this Complaint.

92.     Flight Extenders and Matheson Trucking constitute a single employer for purposes of federal law, with centralized labor relations, common ownership, common management, and unified operations.

93.     Plaintiffs Mahamet Camara, Moussa Dembele, Andre De Oliveira, Bemba Diallo, Salif Diallo, Macire Diarra, Dominique Dickerson, Ernie Duke, and Earnest Williams are black employees who are or have been employed by Defendants.

94.     During the course of their employment with Defendants, Plaintiffs Mahamet Camara, Moussa Dembele, Andre De Oliveira, Bemba Diallo, Salif Diallo, Macire Diarra, Dominique Dickerson, Ernie Duke, and Earnest Williams have been subjected to a hostile work environment because of their race.

95.     The hostile work environment to which Plaintiffs Mahamet Camara, Moussa Dembele, Andre De Oliveira, Bemba Diallo, Salif Diallo, Macire Diarra, Dominique Dickerson, Ernie Duke, and Earnest Williams have been subjected was and is sufficiently severe and pervasive

to alter the terms and conditions of their employment.

96.     By subjecting Plaintiffs Mahamet Camara, Moussa Dembele, Andre De Oliveira, Bemba Diallo, Salif Diallo, Macire Diarra, Dominique Dickerson, Ernie Duke, and Earnest Williams to this hostile work environment, Defendants have denied them the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship enjoyed by white employees.

97.     Plaintiffs Mahamet Camara, Moussa Dembele, Andre De Oliveira, Bemba Diallo, Salif Diallo, Macire Diarra, Dominique Dickerson, Ernie Duke, and Earnest Williams have suffered economic damages as a result of the hostile work environment to which Defendants have subjected them.

98.     Plaintiffs Mahamet Camara, Moussa Dembele, Andre De Oliveira, Bemba Diallo, Salif Diallo, Macire Diarra, Dominique Dickerson, Ernie Duke, and Earnest Williams have suffered emotional distress and other damages as a result of the hostile work environment to which they have been subjected by Defendants.

99.     Defendants' conduct in subjecting Plaintiffs Mahamet Camara, Moussa Dembele, Andre De Oliveira, Bemba Diallo, Salif Diallo, Macire Diarra, Dominique Dickerson, Ernie Duke, and Earnest Williams to a hostile work environment has been deliberate and malicious and exhibits wanton disregard for the rights of these Plaintiffs.

**SECOND CLAIM FOR RELIEF – DISCRIMINATION: TERMS AND CONDITIONS**
(By Camara, Dembele, De Oliveira, B. Diallo, S. Diallo, Diarra, Dickerson, Duke, Kaba and Williams; Against Matheson Trucking and Flight Extenders)

100.     Plaintiffs incorporate herein all of the foregoing allegations in this Complaint.

101.     Defendants have engaged in a pattern and practice of discriminating against black and African employees with respect to the terms and conditions of employment at the Denver

Facility.

102.    Pursuant to this pattern and practice, Defendants have discriminated against Plaintiffs Mahamet Camara, Moussa Dembele, Andre De Oliveira, Bemba Diallo, Salif Diallo, Macire Diarra, Dominique Dickerson, Ernie Duke, and Earnest Williams with respect to virtually all terms and conditions of employment, including but not limited to: promotion, furlough, recall, hours, vacation pay, benefits, hourly wage, work shifts, support and assistance, discipline, job assignment, work days, work environment, holiday pay, layoffs, check-in times, length of breaks, and overtime pay.

103.    Defendants have discriminated against Plaintiffs Moussa Dembele, Bemba Diallo, Macire Diarra, Ernie Duke, and Earnest Williams with respect to termination of employment and constructive discharge.

104.    Defendants discriminated against Mohamed Kaba with respect to hiring by refusing to offer him employment.

105.    All of these Plaintiffs have suffered both economic and non-economic damages as a result of Defendants' pattern and practice of discrimination and the specific discriminatory acts set forth in this Complaint.

106.    Defendants' conduct in subjecting Plaintiffs Mahamet Camara, Moussa Dembele, Andre De Oliveira, Bemba Diallo, Salif Diallo, Macire Diarra, Dominique Dickerson, Ernie Duke, Mohamed Kaba, and Earnest Williams to discrimination has been deliberate and malicious and exhibits wanton disregard for the rights of these Plaintiffs.

## THIRD CLAIM FOR RELIEF – RETALIATION
(By Camara, De Oliveira, B. Diallo, S. Diallo, Diarra, Dickerson, Duke, and Patricelli; Against Matheson Trucking, Flight Extenders, and Matheson)

107.    Plaintiffs incorporate herein all of the foregoing allegations in this Complaint.

108.    Beginning from the time they learned of the initial Charges of Discrimination filed by Plaintiffs, in or about early April 2011, and continuing to the present, Defendants have systematically retaliated against Plaintiffs. This retaliation has occurred both through direct management action and by encouraging and allowing white coworkers to retaliate.

109.    Flight Extenders and Matheson Trucking have carried out this retaliation at the direction of Defendant Mark Matheson.

110.    Defendants retaliated against Mahamet Camara, Andre De Oliveira, Bemba Diallo, Salif Diallo, Macire Diarra, Dominique Dickerson, Ernie Duke, and Dean Patricelli by treating them adversely with respect to virtually all terms and conditions of employment, including but not limited to: promotion, furlough, recall, hours, vacation pay, benefits, hourly wage, work shifts, support and assistance, discipline, job assignment, work days, work environment, holiday pay, layoffs, check-in times, length of breaks, and overtime pay and by subjecting them to a hostile work environment.

111.    Defendants retaliated against Bemba Diallo, Macire Diarra, Ernie Duke, and Dean Patricelli by terminating their employment or constructively discharging them.

112.    Each of Plaintiffs Mahamet Camara, Andre De Oliveira, Bemba Diallo, Salif Diallo, Macire Diarra, Dominique Dickerson, Ernie Duke, and Dean Patricelli has suffered economic and non-economic damages as a result of the retaliatory actions of Defendants.

113.    Defendants' conduct in subjecting Plaintiffs Mahamet Camara, Andre De Oliveira, Bemba Diallo, Salif Diallo, Macire Diarra, Dominique Dickerson, Ernie Duke, and Dean Patricelli to

retaliation has been deliberate and malicious and exhibits wanton disregard for the rights of these Plaintiffs.

**WHEREFORE,** Plaintiffs respectfully request that this Court grant them the following relief:

1. Back pay and actual damages in an amount to be shown at trial to compensate them for lost wages, benefits, and employment opportunities;

2. Front pay in an amount to be shown at trial, and/or reinstatement;

3. Compensatory and punitive damages;

4. Reasonable attorneys' fees and costs of this litigation as provided under the Civil Rights Act of 1866, as amended;

5. Pre-judgment and post-judgment interest and costs of this action together with reasonable expert witness fees as provided by law;

6. Permanent injunctions restraining these violations of the Civil Rights Act of 1866; and

7. Such other and further relief as this Court deems necessary and proper.

### JURY TRIAL DEMAND

Plaintiffs respectfully request a jury trial on all questions of fact raised by this complaint.

Respectfully submitted this 19th day of November, 2012.


LOHF SHAIMAN JACOBS HYMAN & FEIGER PC          JESTER GIBSON & MOORE, LLP


Lynn D. Feiger
lfeiger@lohfshaiman.com

Brian T. Moore
bmoore@jgllp.com
1999 Broadway, Suite 3225
Denver, CO  80202
(303) 377-7888

Stephen E. Kapnik
skapnik@lohfshaiman.com


Justin M. Plaskov
jplaskov@lohfshaiman.com
950 S. Cherry St., Suite 900
Denver, CO  80246
(303) 753-9000