**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

CIVIL ACTION NUMBER:  12-cv-03040-CMA-CBS

MAHAMET CAMARA, MOUSSA DEMBELE, ANDRE DE OLIVEIRA, BEMBA DIALLO,
SALIF DIALLO, MACIRE DIARRA, ERNIE DUKE, MOHAMED KABA, DEAN
PATRICELLI, and ERNEST WILLIAMS, individuals,

Plaintiffs,

CRESCENCIO SANCHEZ, individual,

Plaintiff-in-intervention,

v.

MATHESON TRUCKING, INC., a California corporation, MATHESON FLIGHT
EXTENDERS, INC., a California corporation,

Defendants.

---

## PRETRIAL ORDER

---

## 1. DATE AND APPEARANCES

Tuesday, June 24, 2014.

Appearing for Plaintiffs: Brian T. Moore, Jester, Gibson & Moore, LLP; Stephen

E. Kapnik and Justin M. Plaskov, Lohf Shaiman Jacobs Hyman & Feiger PC.

Appearing for Defendants: Stacey A. Campbell and Daniel M. Combs, Littler

Mendelson, P.C.

Appearing for Intervenor: Mark J. Berumen, Berumen Law Firm, P.C.

## 2. JURISDICTION

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1337.

This action arises under the Civil Rights Act of 1866, as amended, 42 U.S.C. §§ 1981 and 1981a, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

Jurisdiction also is invoked pursuant to 28 U.S.C. § 1367 by Plaintiff Salif Diallo. Mr. S. Diallo asserts a state law claim for unpaid wages under the Colorado Wage Claim Act, Colo. Rev. Stat. § 8-4-109.

Defendants state that the Court's jurisdiction over Plaintiffs' and Plaintiff-Intervenor's claims under Title VII of the Civil Rights Act of 1964 is limited to those claims which fell within the scope of the charges Plaintiffs and Plaintiff-Intervenor filed with the Equal Employment Opportunity Commission.

### 3. CLAIMS AND DEFENSES

a.    <u>Plaintiffs' statement</u>:

This case involves mostly black and African employees working as mail handlers who were discriminated against on the basis of race and national origin, subjected to a hostile work environment, and retaliated against after they complained.  One Plaintiff worked as a tug driver; one Plaintiff was an applicant; and one was a white employee who opposed the illegal discrimination against the other Plaintiffs and was consequently terminated.

The events directly relevant to this action began in August and September 2010, when Defendants hired a large number of temporary material handlers to work at their Denver facility, in anticipation of the beginning of a new contract Defendants had been awarded by the U.S. Postal Service (the "Pilot Project").  Day shift supervisor Terry Goodwin hired a significant number of African immigrants to work the night shift, with

most beginning work by mid-September. Others in management, including Station Manager Leslie Capra (who worked primarily at night), did not welcome these new African hires, and soon conspired to bring about the termination of most of the African and other black employees on the night shift.

Capra chose Plaintiff Moussa Dembele to terminate first, after he stood up to a white co-worker who was treating him in a demeaning fashion.  At about the time of Dembele's termination, Capra learned that the Pilot Project was going to be suspended for a month in early December, resulting in a temporary reduction in the necessary work hours.  Rather than reduce the hours of all material handlers proportionately, she announced to her superiors a plan to use the reductions to completely furlough undesired workers, hire new employees to replace the furloughed workers when the Pilot Project resumed, and then terminate the furloughed workers for supposed lack of work.  She and Supervisor Shawn Taylor then proceeded to select almost every black African material handler for furlough, whether temporary or regular, and no matter how long tenured, while furloughing few whites.  She also selected African Americans for furlough at disproportionate rates and, while furloughed workers were occasionally called into work during the month, the furloughed white workers were called in far more frequently than black workers.

On behalf of multiple Plaintiffs, Plaintiff Bemba Diallo made a timely complaint of discrimination to the human resources director in Defendants' corporate office, Mike Wilbourn.  This led Capra to abandon her plan to replace and terminate the furloughed workers.  Nonetheless, the total hours worked by black material handlers during the

month was reduced by fifty percent, while white material handlers saw only a two percent reduction, and this adverse action affected almost all Plaintiffs.

The furlough should not have affected Plaintiff Earnest Williams, because although holding the job title material handler, he worked as a tug driver on the night shift.  Tug drivers did not work on the Pilot Project, such that Williams' job was completely unaffected by the suspension of the Pilot Project.  Nonetheless, at the same time Defendants furloughed other black workers, they took one of Williams' four weekly shifts away from him, and gave it to a far less-senior white employee.  Near the end of the month, Defendants took away another of Williams' shifts.  When Williams confronted Taylor about this, Taylor acknowledged that he and Capra were doing this in order to force Williams to retire.  Having had his shifts cut in half, having been told that management was acting to force him out, and having been subjected to other demeaning treatment, Williams was constructively discharged on January 2, 2011.

Later in January, Defendants cut the hours of B. Diallo, Mahamet Camara, and Macire Diarra, without business justification.  In ordering these cuts, Capra was motivated by discriminatory and retaliatory animus.

After further complaints by and on behalf of the Plaintiffs, Defendants conducted a cursory "investigation" that did not involve talking with a single one of the complaining employees.  Defendants took no remedial action, but merely expressed support for Capra and urged her to continue "business as usual."

Emboldened by this support, Capra's retaliation and discrimination continued after most Plaintiffs filed EEOC Charges in late March and early April. Almost

immediately, Capra and Taylor hatched a plan to make permanent, several of the white temporary employees hired the previous fall, without similarly promoting any of the temporary employees who had filed Charges of Discrimination.  This was done in anticipation of an upcoming bid, in which permanent employees would be permitted to bid shifts before temporary employees.

When the shift bids packages were distributed in June 2011, the shifts were structured in such a manner as to be incompatible with the existing schedules of several night shift employees with other jobs.  White employees who had this problem were accommodated, either by allowing them to continue working their existing schedules without submitting a bid at all, or by allowing them to continue working their existing schedules, even though they bid on and were awarded a different schedule.  Three black Plaintiffs who had filed Charges of Discrimination against Matheson – De Oliveira, Diarra, and Duke – were not similarly accommodated, but instead found themselves out of work after the shift bid. Although each was technically "on call," they – unlike white employees on call – never were called into work and ultimately were terminated.

During this same period, white Plaintiff Dean Patricelli began opposing the discrimination and harassment he was witnessing.  He did so on several occasions by speaking directly with leads, supervisors, and managers, and he also signed a Declaration in support of the black Plaintiffs' Charges of Discrimination.  In September 2011, Defendants seized a pretext and terminated Patricelli's employment in retaliation for his protected activity.

Also by the fall of 2011, Defendants had adopted a policy of not hiring any Africans to work at their Denver facility.  Plaintiff Mohamed Kaba applied for a position as a material handler during this period.  He was passed over in favor of several white applicants, some of whom were less qualified than him.  Defendants' stated reason for not hiring Kaba – that he did not have forklift experience – is false, as shown by the fact that most if not all of the white employees hired during this period were hired for non-forklift shifts.

Throughout the entire period discussed above, the workplace on the night shift at Defendants' Denver facility was permeated with hostile and demeaning treatment of black and African employees.  This included:  physical segregation in the workplace; failure to promote or make permanent; denying holiday work, sending black employees home early, and otherwise preventing black employees from working equal hours; forcing black employees to work harder when on the clock; racial epithets and other slurs; and generally demeaning treatment of black material handlers by the white manager (Capra, into the fall of 2011), supervisors, leads, and co-workers.  This harassment was racially-motivated and sufficiently severe and pervasive to alter the terms and conditions of each of the black Plaintiffs, except for Kaba.

In the winter of 2011-2012, Defendants finally hired an investigator, Steven Biskup, to investigate Plaintiffs' claims. Biskup conducted dozens of hours of interviews and ultimately provided nearly two-hundred pages of written report to Defendants, in which he generally found Plaintiffs credible, their allegations supported, and admonished Matheson for its failure to rectify the discrimination or otherwise

appropriately address the racially hostile environment at Matheson. Rather than take any corrective action, Matheson claims they never read the report, concluding that it was not worth the time, because it substantiated Plaintiffs' claims.

Keeping their heads in the sand, Defendants continued to treat its African employees with disrespect and discriminated against them with regard to terms and conditions of employment. In the summer of 2013, S. Diallo could not endure the treatment any longer and was constructively discharged from his employment.  As of the date of his separation, he had multiple weeks of earned, vested, and determinable vacation that Matheson had never allowed him to utilize. S. Diallo timely sent a written demand for payment of wages, but Matheson ignored his notice and has not paid him for his earned and accrued vacation time in an additional act of discrimination and retaliation.

Based on the foregoing facts:

1.  Plaintiffs Camara, Dembele, De Oliveira, B. Diallo, S. Diallo, Diarra, Duke, Kaba, and Williams assert a claim that Defendants discriminated against them because of their race in violation of Title VII and Section 1981;

2.  Plaintiffs Camara, Dembele, De Oliveira, B. Diallo, S. Diallo, Diarra, Duke, Kaba, and Williams assert a claim that Defendants denied them the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship enjoyed by white employees in violation of Section 1981.

3.  Plaintiffs Camara, Dembele, De Oliveira, B. Diallo, S. Diallo, Diarra, and Kaba assert a claim that Defendants discriminated against them with respect to the terms and conditions of their employment on the basis of their national origin in violation of Title VII;

4.  Plaintiffs Camara, De Oliveira, B. Diallo, S. Diallo, Diarra, Duke, and Patricelli assert a claim that Defendants retaliated against them for engaging in activity protected by Title VII and Section 1981;

5.  Plaintiffs Camara, Dembele, De Oliveira, B. Diallo, S. Diallo, Diarra, Duke, and Williams assert a claim that Defendants discriminated against them because of their race and/or national origin by subjecting them to a severe and pervasive hostile work environment in violation of Title VII and Section 1981;

6.  Plaintiffs allege that the discriminatory actions taken against them by Defendants were part of Defendants' pattern and/or practice of discriminating against black and/or African employees with respect to the terms and conditions of employment;

7.  Plaintiff S. Diallo asserts a claim that Defendants failed to pay him earned, vested, and determinable vacation pay after his separation from employment, in violation of the Colorado Wage Act;

8.  Plaintiffs allege that defendants constitute a single employer, based on their extensive interrelation of operations, common management,

8

centralized control of labor relations in the person of Michael Wilbourn, and common ownership and financial control;

9.  Plaintiffs allege that Defendants took the foregoing actions intentionally, maliciously, and with reckless disregard for Plaintiffs' rights; and

10.  Plaintiffs allege that they were jointly employed by the two defendants, because the two defendants jointly controlled the terms and conditions of Plaintiffs' employment, including with respect to most of the specific adverse employment actions complained of herein.

b.  <u>Defendants' statement</u>:

Defendants made legitimate business decisions about their operations and the employees working for Matheson Flight Extenders.  Those business decisions are not made discriminatory simply because Plaintiffs and Plaintiff-Intervenor do not like the decisions that Defendants made or because Plaintiffs and Plaintiff-Intervenor believe a different decision should have been made. Defendants deny that they discriminated against Plaintiffs or Plaintiff-Intervenor because of their race or any other protected status, deny that Defendants retaliated against Plaintiffs or and Plaintiff-Intervenor, and deny that Plaintiffs or and Plaintiff-Intervenor were subject to a hostile work environment. Plaintiffs' and Plaintiff-Intervenor's allegations that Matheson Flight Extenders was a segregated workplace permeated with racist epithets and in which skin color motivated management's decision-making are wholly without foundation, especially when other black, African, and Hispanic Matheson Flight Extenders

employees – who chose not to be part of Plaintiffs' litigation—do not claim that they were subjected to the environment Plaintiffs and Plaintiff-Intervenor describe.

Matheson contracts with the United States Postal Service and other commercial carriers breaking down, building, and transporting shipping boxes at a facility close to Denver International Airport. The terms and conditions of employment for Matheson Flight Extenders' Material Handlers and Forklift Drivers—including Plaintiffs and Plaintiff-Intervenor—allow for very little variation. By way of example, employees are paid in accordance with a Wage Determination, so no variation in compensation exists among employees in a given classification.

Leslie Capra, former Matheson Flight Extenders' Station Manager, made a business decision to hire employees, including black and African employees along with various other employees from different races and nationalities, in the fall of September 2010.   Plaintiffs' claim of a discriminatory furlough is baseless. In December 2010 Matheson Flight Extenders reduced hours across the board based on business needs—when one contract with the Post Office was temporarily suspended. Management's business decision reduced the number of its employees based on legitimate, non-discriminatory reasons, and ultimately brought the employees back to work once the contract was re-issued. The reduction in hours was not related in any way to employees' race or any other non-business related criterion.

Plaintiffs' and Plaintiff-Intervenor's additional claims of discrimination and retaliation also are without merit. All actions taken by Defendants and challenged by

Plaintiffs and Plaintiff-Intervenor in this action were taken in good faith and were based on legitimate, nondiscriminatory business reasons.

Ms. Capra agreed to re-hire B. Diallo, a black African, based upon the recommendation of supervisors who had worked with B. Diallo previously and believed him to be a productive worker.   B. Diallo was selected to be on-call during the December 2010 furlough because he could not work a full-shift and he also told workers to slow down because they were working "too fast."   B. Diallo did not like being placed on-call because he believed he had more seniority than other employees and should have been allowed to continue to work his schedule—leaving the shift early—even though Ms. Capra made business decisions to place employees on call if they could not work the full shift and/or were not considered the most productive employees.   Plaintiff Ernie Duke was also placed on call in December 2010 because he too had to leave his shift early.   Although management had accommodated both B. Diallo's and Duke's early departures from work—many times, before all of the work was completed for the their coworkers on their shift—Ms. Capra made a business decision to have employees work their full shifts during the December 2010 peak season.   Her decision was not based upon seniority as B. Diallo and Duke thought it should be and it was B. Diallo's dissatisfaction with Ms. Capra's business decision that started his claims of discrimination.

B. Diallo also had various workplace disputes with other employees and eventually had his employment terminated because of an altercation management found that he started with another black African employee who refused to succumb to B.

Diallo's demands to join this lawsuit, even if he had to "lie."  B. Diallo was not performing his duties to management's satisfaction—he was not doing what management wanted him to do—because he caused disruptions in the workplace.  The fact that B. Diallo may have been considered a productive worker at one time in his employment with Matheson Flight Extenders, does not cast doubt on the impressions management made about B. Diallo's disruptions in the workplace based on his own actions.

Ms. Capra approved the hiring of Plaintiff Moussa Dembele in September 2010 and he is a black African.  Unfortunately, Dembele seemed to not understand the work he was hired to do and stood back and watched others as they worked and did not readily engage in the work he was hired to do.  Because of his poor performance, management made the business decision to terminate Dembele's employment.  The fact that Dembele does not agree with management's impressions of his performance and the ultimate decision to terminate his employment, does not make Matheson Flight Extenders' decision discriminatory.

Plaintiff Ernest Williams resigned his employment in January 2011 and Matheson Flight Extenders made the business decision to accept Williams' resignation.  Williams had been discussing his retirement plans with both employees and management and "everyone" knew he was going to retire.  The fact that Williams resigned his employment and later learned that black and African employees were filing discrimination claims against Matheson Flight Extenders, does not make management's decision to accept Williams' resignation discriminatory, especially when Williams voluntarily resigned.

Matheson Flight Extenders developed a shift bidding process in June 2011 in response to an employee meeting and employee requests to eliminate perceived favoritism and because employees wanted the opportunity to bid on the longer-hour Trucking Pilot Program shifts.  Management was told to "create bids that made sense for the operation.  Don't look at what some individual's particular need is because that's where we get into trouble. Create the bids and let them bid on them."  Matheson Flight Extenders business decisions to create shifts that made sense for the operation, as opposed to individual employee needs, is not made discriminatory just because some employees were upset that the previous time periods they worked were not included in the shift bid.

Matheson Flight Extenders also told employees to bid on all available shifts that they could work to have a better chance of being selected for a shift of their choice.  If employees did not bid, management made the business decision—and communicated their decision to all employees as part of the shift bid packet—to not provide those employees with a schedule, but placed them on call.  Duke, Macire Diarra, and Andre De Oliveira did not bid on available shifts even though they could have worked various shifts in the shift bidding process.  Matheson Flight Extenders' business decision to place these employees on call is not made discriminatory or retaliatory simply because Duke, Diarra, and De Oliveira chose not to submit a shift bid, especially when management told them before the shift bidding process that they would be placed on call if they did not bid.

Two shifts were not filled during the shift bidding process and remained open in the fall of 2011.  Matheson Flight Extenders made the business decision to hire material handlers with forklift driving experience for those shifts to assist with the Trucking Pilot Program, which required the use of forklifts in its operation.  Plaintiff Mohamed Kaba, a black African, applied for one of the material handling positions, but was not hired because—as he admits—he did not have forklift driving experience.    Instead, management hired Walter Outlaw, an African American, who had prior forklift driving experience.    Mr. Outlaw's employment was terminated after management received Mr. Outlaw's unfavorable criminal background check.    Matheson Flight Extenders' business decision to hire Mr. Outlaw over Kaba, is not made discriminatory simply because Kaba and B. Diallo do not like management's hiring decision or the decision to look for a material handler with forklift driving experience.

Plaintiff Dean Patricelli is Caucasian.  Patricelli provided a declaration to the EEOC on behalf of the black and African plaintiffs, but he never told management about the declaration.  He claims, in this lawsuit, that management retaliated against him for providing the declaration, but Matheson Flight Extenders was not aware that Patricelli gave the declaration until after his employment was terminated and when it became a party to this lawsuit, which by itself precludes Patricelli's retaliation claim.

Matheson Flight Extenders made the business decision to terminate Patricelli's employment after a female coworker complained of sexual harassment against Patricelli and after management investigated the complaint—including speaking with Patricelli. Management had the right to rely upon the information that was before it at the time of

the sexual harassment claim and management's business decision to terminate Patricelli because of sexual harassment is not made retaliatory simply because Patricelli does not agree with management's business decision.  More importantly, Patricelli does not believe management retaliated against him when he was terminated; instead, he just did not like the fact that management did not take a written statement from him.

Plaintiff Salif Diallo, a black African, did not seem to understand Matheson Flight Extenders' policy on when vacation was earned and paid in accordance with the Service Contract Act ("SCA").  S. Diallo resigned his employment because he believed Matheson Flight Extenders owed him for vacation when under the SCA, he accrued vacation on his anniversary date.   When S. Diallo resigned his employment, management made the business decision to accept his resignation.

Plaintiff intervenor Crescencio Sanchez is Mexican American and had difficulties dealing with his coworkers.  Plaintiff Patricelli describes Sanchez as someone who "stirs the pot" at work.  Sanchez also had an almost constant inability to get along with co-worker Amy Hodges.   Both Sanchez and Ms. Hodges complained to management about each other, but despite its best efforts, management could not find corroborating witnesses to their respective complaints about each other.  Ms. Hodges believes she and Sanchez do not get along because early in her employment, Sanchez made advances, which she rejected.  Because of their disruption in the workplace, neither Sanchez nor Ms. Hodges was doing what management expected.

Sanchez also enlisted the help of black coworker Claude Lowery to try to get women to join the lawsuit.  Two female employees complained to management that

Sanchez asked them to join the lawsuit on an almost daily basis for a period of time and, when they told him that they did not feel discriminated against, Sanchez told them to lie and that he would draft or had drafted an affidavit for them to sign.  In a "good cop, bad cop" scenario, Sanchez and Lowery continue to pressure the women into joining the lawsuit and when they continued to refuse to join, Lowery (the bad cop) told one of the female employees that he would bring his gang back and "fuck her hole." After management investigated the complaint by the two female employees, Matheson Flight Extenders made the business decision to terminate Lowery's employment and to move Sanchez to another shift to get him away from the female coworkers who complained. Sanchez was unable or unwilling to work the new shift and his employment was terminated for failing to show up for work.   Matheson Flight Extenders' business decision to move Sanchez to a different shift and later to terminate Sanchez' employment after he refused to show up for work and failed to call in for work, is not made discriminatory simply because Sanchez disagrees with management's decisions.

Defendants exercised reasonable care to prevent and promptly correct any discriminatory behavior and Plaintiffs unreasonably failed to take advantage of the preventative or corrective opportunities provided by Defendants to avoid harm.

Plaintiffs' Complaint and Plaintiff-Intervenor's Complaint-in-Intervention fail to state facts sufficient to state a claim that would support an award of compensatory or punitive damages.   Matheson Trucking and Matheson Flight Extenders maintain a policy prohibiting discrimination that they widely publicize and train their employees and supervisors to comply with, and Defendants make good faith efforts to prevent

discrimination from occurring in the workplace. Accordingly, Plaintiffs and Plaintiff-Intervenor are not entitled to recover punitive damages from Defendants.

Plaintiffs' and Plaintiff-Intervenors' alleged damages also are subject to applicable statutes and the claims raised at the EEOC and some of Plaintiffs' and Plaintiff-Intervenor's claims also may be barred, in whole or in part, by applicable statutes of limitations to the extent they failed to exhaust their administrative remedies.  From the examples of Plaintiff's and Plaintiff-Intervenor's actions described above in the workplace, Plaintiffs' and Plaintiff-Intervenor's requests for relief also may be barred by the doctrine of unclean hands.

      c.    <u>Intervenor's Statement</u>:

    During the same period the black and African employees were experiencing the discriminatory behavior, Plaintiff-in-Intervention, Cesencio Sanchez was also being subjected to discrimination and later retaliation when he reported the discriminatory behavior to his supervisors.

    Mr. Sanchez was employed by the Defendants from December 2009 until his termination on July 5, 2012.  While employed by the Defendants, Mr. Sanchez and Plaintiff Bemba Diallo were referred to as "nigger" and "wetback" by Mr. Jeremy Doudna, a Lead working at the Denver facility for Matheson.  Mr. Sanchez was also called a "fucking asshole Mexican", a "wetback", and told "go back to Mexico" by his coworkers.  This harassment was racially-motivated and sufficiently severe and pervasive to alter the terms and conditions of Mr. Sanchez's employment.

Mr. Sanchez reported the discriminatory behavior he was experiencing on several occasions by speaking directly with leads, supervisors, and managers.  He also wrote letters complaining about the way he and his coworkers were being discriminated against, both anonymously and signed with his name.  He sent the letters to the head of Human Resources; however, instead of addressing the problems, Matheson labeled Mr. Sanchez as a trouble maker and made every effort to discipline him for daring to complain about this behavior.

As it did with the black and African employees, in the winter of 2011-2012, Defendants finally hired an investigator, Steven Biskup, to investigate Plaintiffs' and Plaintiff-in-Intervention's claims.  Mr. Biskup conducted dozens of hours of interviews and ultimately provided nearly two-hundred pages of written report to Defendants, in which he generally found the Plaintiffs and the Plaintiff-in-Intervention credible, their allegations supported, and admonished Matheson for its failure to rectify the discrimination or otherwise appropriately address the racially hostile environment at Matheson. Rather than take any corrective action, Matheson claims they never read the report, concluding that it was not worth the time, because it substantiated Plaintiffs' claims.

In March, 2012, Mr. Sanchez was suspended from work for five days and in April, 2012, was transferred to an "on-call" position which no longer guaranteed regular work or pay because he would only work if the company called him when they needed.  The suspension and transfer to an "on-call" position was predicated on a pretextual reason.

Based on the foregoing facts, Mr. Sanchez asserts:

1. A claim that Defendants discriminated against him because of his race in violation of Title VII and Section 1981;

2. A claim that Defendants denied him the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship enjoyed by white employees in violation of Section 1981.

3. A claim that Defendants retaliated against him for engaging in activity protected by Title VII and Section 1981;

4. A claim that Defendants discriminated against him because of his race and/or national origin by subjecting him to a severe and pervasive hostile work environment in violation of Title VII and Section 1981;

5. Defendants constituted a single employer, based on their extensive interrelation of operations, common management, centralized control of labor relations in the person of Michael Wilbourn, and common ownership and financial control;

6. Defendants took the foregoing actions intentionally, maliciously, and with reckless disregard for his rights; and

7. He was jointly employed by the two defendants, because the two defendants jointly controlled the terms and conditions of his employment, including with respect to most of the specific adverse employment actions complained of herein.

## 4. STIPULATIONS

a.    Facts:

1.    Defendant Matheson Trucking, Inc. ("Matheson Trucking") is a national transportation carrier which provides services to the United States Postal Service and private delivery services.

2.    Defendant Matheson Flight Extenders, Inc. ("Matheson Flight Extenders") is a division of Matheson Trucking which specializes in terminal handling and ground support services for the United States Postal Service and other commercial carriers across the United States.

3.    Matheson Flight Extenders maintains and operates a facility close to Denver International Airport.

4.    Moussa Dembele was terminated from Matheson Flight Extenders on November 10, 2010.

5.    The Consolidation/Deconsolidation pilot program ("Pilot Project") was suspended between December 4, 2010 and January 3, 2011.

6.    Plaintiffs Mahamet Camara, Moussa Dembele, Andre De Oliveira, Bemba Diallo, Salif Diallo, Macire Diarra, Ernie Duke, Dean Patricelli, and Ernest Williams, and Plaintiff-Intervenor Crescencio Sanchez are current and former employees of Matheson Flight Extenders.

7.    Bemba Diallo was placed on call from Matheson Flight Extenders December 4, 2010 – January 3, 2011.

8.    Mahamet Camara was placed on call from Matheson Flight Extenders December 4, 2010 – January 3, 2011.

9.    Salif Diallo was placed on call from Matheson Flight Extenders December 4, 2010 – January 3, 2011.

10.    Ernie Duke was placed on call from Matheson Flight Extenders December 4, 2010 – January 3, 2011.

11.    Macire Diarra was placed on call from Matheson Flight Extenders December 4, 2010 – January 3, 2011.

12.    Earnest Williams is African American.

13.    Ernie Duke is African American.

14.    In August 2011, Andre De Oliveira was placed on call.

15.    Dean Patricelli is Caucasian.

16.    On September 8, 2011, Matheson Flight Extenders terminated Dean Patricelli's employment.

17.    Mohamed Kaba is a black African man, originally from the Republic of Guinea.

18.    Plaintiff Mohamed Kaba applied for employment at Matheson flight Extenders.

19.    Mohamed Kaba was not offered employment at Matheson Flight Extenders.

20.    Cresencio Sanchez was placed on an "on-call" status in April 2012.

21.    Cresencio Sanchez's employment was terminated on July 5, 2012.

## 5. PENDING MOTIONS

1. Defendants' Motion for Partial Summary Judgment (doc. # 72), filed December 24, 2014.

   a.  Response (doc. # 85) filed by Plaintiffs' on February 7, 2014.

   b.  Reply (doc. # 95) filed by Defendants on March 17, 2014.

2. Plaintiffs' and Intervenor's Motion for Partial Summary Judgment (doc. # 89), filed February 22, 2014.

   a.  Brief in Opposition (doc. # 96) filed by Defendants on March 17, 2014.

   b.  Reply (doc. # 99) filed by Plaintiffs and Intervenor on April 3, 2014

3. Plaintiffs' Motion to Strike (doc. # 97) filed on March 26, 2014.

   a.  Response (doc. # 101) filed by Defendants on April 21, 2014.

  b.  Reply (doc. # 105) filed by Plaintiffs on May 6, 2014.

 4. Plaintiffs' Motion for Leave to File Surresponse (doc. # 98) filed on March 26,

2014.

  a.  Response (doc. # 102) filed by Defendants on April 21, 2014.

  b.  Reply (doc. # 104) filed by Plaintiffs on May 6, 2014.

## 6. WITNESSES

a.  Plaintiffs' and Intervenor's Witnesses – list attached as Exhibit A.

b.  Defendants' Witnesses – list attached as Exhibit B.

## 7. EXHIBITS

a.  Plaintiffs' and Intervenor's Exhibits – list attached as Exhibit C.

b.  Defendants' Exhibits – list attached as Exhibit D.

c.  Copies of listed exhibits must be provided to opposing counsel and any

pro se part no less than 30 days before trial. The objections contemplated by Fed. R.

Civ. P. 26(a)(3) shall be filed with the clerk and served by and delivery or facsimile no

later than 14 days after the exhibits are provided.

## 8. DISCOVERY

 Discovery has been completed, with one exception.  Plaintiffs have been granted

leave to take the deposition of Defendants' endorsed expert, Lisa Meer, up until 60 days

before trial (doc. # 79).  Unless otherwise ordered, upon a showing of good cause in an

appropriate motion, there will be no other discovery allowed after entry of the final

pretrial order.

## 9. SPECIAL ISSUES

None.

## 10. SETTLEMENT

The undersigned counsel certify that:

a.      Counsel for the parties met in person at various times to discuss in good

         faith the settlement of the case.

b.      The parties were promptly informed of all offers of settlement.

c.      Counsel for the parties do not intend to hold future settlement

         conferences.

d.      It appears from the discussions that there is little possibility of settlement.

e.      Counsel for the parties considered ADR in accordance with

         D.C.COLO.LCivR 16.6, and conducted a multi-day mediation shortly

         before the filing of this action.

## 11. OFFER OF JUDGMENT

Counsel acknowledge familiarity with the provision of rule 68 (Offer of Judgment) of the Federal Rules of Civil Procedure. Counsel have discussed it with the clients against whom claims are made in this case.

## 12. EFFECT OF PRETRIAL ORDER

Hereafter, this Pretrial Order will control the subsequent course of this action and the trial, and may not be amended except by consent of the parties and approval by the court or by order of the court to prevent manifest injustice. The pleadings will be deemed merged herein. This Pretrial Order supersedes the Scheduling and Discovery

Order. In the event of ambiguity in any provision of this Pretrial Order, reference may be made to the record of the Pretrial Conference to the extent reported by stenographic notes and to the pleadings.

## 13. TRIAL AND ESTIMATED TRIAL TIME/FURTHER TRIAL PREPARATION PROCEEDINGS

1.  Trial is to be to a jury;

2.  Estimated to take seventeen days;

3.  In Denver, Colorado; and

4.  [orders pertinent to the trial proceedings.]

DATED this 24th day of June, 2014.

BY THE COURT:

s/ Craig B. Shaffer
Craig B. Shaffer
United States Magistrate Judge

**PRETRIAL ORDER APPROVED:**

JESTER GIBSON & MOORE, LLP
*Attorneys for Plaintiffs*


/s/ Brian T. Moore
Brian T. Moore
1999 Broadway, Suite 3225
Denver, Colorado 80202
(303) 339-4779
BMoore@jgllp.com

And

LOHF SHAIMAN JACOBS
HYMAN & FEIGER PC

Lynn D. Feiger
Stephen E. Kapnik
Justin M. Plaskov
950 South Cherry Street # 900
Denver, Colorado 80246
(303) 753-9000
skapnik@lohfshaiman.com

BERUMEN LAW FIRM, P.C.


*Attorney for the Plaintiff-in-Intervention*

/s/ Mark J. Berumen
Mark J. Berumen
1450 S. Havana St., Suite 412
Aurora, CO 80202
(303) 751-2128
markberumen@berumenlaw.com


Littler Mendelson
*Attorneys for Defendants*


s/ Daniel M. Combs
Stacey A. Campbell
Kalisha Salome Chorba
Daniel M. Combs
LITTLER MENDELSON, P.C.
A Professional Corporation
1900 Sixteenth Street
Suite 800
Denver, CO  80202
Telephone:  303.629.6200

ATTORNEYS FOR DEFENDANTS


Firmwide:127508150.1 064487.1003