UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CIVIL ACTION NUMBER: 12-cv-03040-CMA-CBS

MAHAMET CAMARA, MOUSSA DEMBELE, ANDRE DE OLIVEIRA, BEMBA DIALLO, SALIF DIALLO, MACIRE DIARRA, ERNIE DUKE, MOHAMED KABA, DEAN PATRICELLI, and ERNEST WILLIAMS, individuals,

Plaintiffs,

v.

MATHESON TRUCKING, INC., a California corporation, and MATHESON FLIGHT EXTENDERS, INC., a California corporation,

Defendants.

## PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY

Plaintiffs, by their undersigned counsel, move the Court to exclude in part the opinion testimony of Lisa Meer proffered by Defendants, and state as grounds therefor:

### CERTIFICATE OF COMPLIANCE

The undersigned certifies that he conferred regarding the relief requested herein by telephone with Stacey Campbell, Esq., lead counsel for Defendants. Mr. Campbell stated that Defendants would oppose this motion.

### INTRODUCTION

Defendants have endorsed Ms. Meer as an expert witness for the sole purpose of testifying in rebuttal to Plaintiffs' expert witness, Patricia Pacey, Ph.D. Dr. Pacey has issued a report and will testify primarily with respect to the back and front pay losses sustained by Plaintiffs. *See* Report of Patricia Pacey ("Pacey Report"), attached as

1

Exhibit A, *passim*. However, she also conducted and will testify to a statistical analysis of racial and national origin disparities in the furlough conducted by Defendants in December 2010. Ms. Meer has issued a report and testified in deposition regarding both portions of Dr. Pacey's report. *See* Report of Lisa Meer ("Meer Report"), attached as Exhibit B, *passim*.

Plaintiffs seek to exclude two portions of Ms. Meer's proffered testimony. First, Plaintiffs seek to exclude Ms. Meer's testimony regarding Dr. Pacey's statistical analysis, because she is unqualified to opine regarding such matters and her testimony is unreliable. Second, Plaintiffs seek to exclude her testimony regarding application of a discount rate to Plaintiffs' economic damages, because her opinions are contrary to settled law, and therefore irrelevant and of no assistance to the trier of fact.

## STANDARD OF REVIEW

This Motion is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

F.R.E. 702. "As interpreted by the Supreme Court, Rule 702 requires that an expert's testimony be both reliable, in that the expert is qualified to testify regarding the subject, and relevant, in that it will assist the trier of fact." *Hubbell v. Carney Bros. Const.*, No. 05-CV-00026-CMA-KLM, 2011 WL 1060239, at *2 (D. Colo. Mar. 23, 2011), *citing Daubert*

*v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–92 (1993) and *Truck Ins. Exchange v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004).

## ARGUMENT

I.  **MS. MEER SHOULD NOT BE PERMITTED TO TESTIFY REGARDING DR. PACEY'S STATISTICAL ANALYSIS**

   A.  **Summary of Relevant Opinions of Dr. Pacey and Ms. Meer.**

Among the adverse employment actions taken by Defendants which Plaintiffs claim to have been discriminatory was a four-week furlough carried out in December, 2010. Eight of the nine black Plaintiffs were placed on call during this furlough.

Dr. Pacey performed two sets of analyses to evaluate whether there is statistical evidence the furlough was discriminatory. In the first, she conducted standard means tests to determine whether there was a statistically-significant correlation between the extent by which each employee's hours decreased during the furlough and (a) whether the employee was black or non-black and (b) whether the employee was African or non-African. In both instances, she determined that black and African employees saw their hours reduced to a greater extent than non-black and non-African employees, and that these disparities were statistically significant. *See* Ex. A, pp. 3-4 and cited tables. Dr. Pacey then ran multiple regression analyses, in which she incorporated and controlled for the additional variables of tenure and shift (*i.e.*, whether or not the employee worked the dayshift, which is the subject of this action). Still Dr. Pacey found statistically significant correlations between the extent to which an employee's hours were reduced and both the employee's race (black vs. non-black) and national origin (African vs. non-African). *Id.* In a supplement to her report, Dr. Pacey re-ran her regression analyses,

adding as an additional variable which contract each employee was working on immediately prior to the furlough (THS or Pilot Project). Doing so did not alter her findings or conclusion. *See* Supplemental Pacey Report, attached as Exhibit C, at pp. 2-4.

Ms. Meer concedes that Dr. Pacey's "math appears to be correct, and [does] not dispute her statistical conclusion." Deposition of Lisa Meer, excerpts attached as Exhibit D, at 44:2-3. However, she faults Dr. Pacey's standard means test based on a supposed rule that in order for such a test to be valid:

> both of the selected samples (in this case, black employees and non-Black employees or African employees and non-African employees) should be normally distributed or greater in number than 30. In this case, the sample of black employees included only 14 employees and the sample of African employees included only 8 employees. As such, the application of a t-test of two means is technically incorrect.

Meer Report, Ex. B, at 54-55. She faults Dr. Pacey's multiple regression analysis by citing a long list of potential variables which Dr. Pacey did not include *Id.* at 55-57. Notably, she does not actually offer an opinion that Dr. Pacey *should* have included any one or more of those potential variables in her analysis, but seems to think it sufficient to list variables which Dr. Pacey might possibly have included, but did not. Meer Depo., Ex. D, at 66:3-17. It is hard to see how this testimony could be helpful to the jury regardless, but, in any event, Ms. Meer is not qualified to testify on this subject.

**B.   Ms. Meer is Unqualified to Testify Regarding Employment Statistics.**

"Under *Daubert*, an expert must first establish his expertise by reference to knowledge, skill, experience, training or education. This requirement is to be treated liberally, but liberal interpretation, 'does not mean that a witness is an expert simply because he claims to be.'" *King v. Enter. Rent-A-Car Co.*, 231 F.R.D. 255, 266 (E.D.

4

Mich. 2004) (*quoting Pride v. BIC Corp.*, 218 F.3d 566, 577–578 (6th Cir.2000)). Moreover, "expert" is not a unitary status which, once obtained, entitles a person to opine in court regarding any matter she likes. Rather, the person must be qualified to speak to the specific topics on which her testimony is offered.

Ms. Meer is not qualified to testify as an expert regarding statistical evidence of discrimination, either by education or other learning/experience. Regarding the former, her only formal training in statistics came in two undergraduate courses taken over thirty years ago. Regarding her rule that a standard means test can be performed only if each sample has at least thirty observations, she admits to having no recollection of whether such a standard was conveyed in those courses.

Q. What formal statistical training have you received?

A. My formal statistical training includes two classes in my undergraduate education at the University of Colorado . . .

Q. In your two undergraduate statistics courses, what were you taught regarding the minimum sample size you have to have to run a reliable standard means test?

A. I have absolutely no idea. That was 32 or 33 years ago.

Meer Depo., Ex. D, at 37:6-38:3.[1]  "[N]o good faith argument can be made that 30 year-old course study is a sufficient qualification to testify as a statistician." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007). Far greater and more relevant academic credentials would be required to serve as the basis for qualifying Ms. Meer to testify as an expert on matters of statistical analysis. *See Reid v. Albemarle Corp.*, 207

---

[1]The only degree Ms. Meer has received is a bachelor's of science in accounting from the University of Colorado in 1984. *See* Meer Bio, attached as Exhibit E.

F. Supp. 2d 499, 501 (M.D. La. 2001) (declining to accept as "expert in statistical science principles" an individual who held a Ph.D. in sociology, undergraduate degree in economics, and a "minor in statistics").

Likewise, Ms. Meer is not qualified by experience or other acquired knowledge to testify regarding employment statistics. She is a financial analyst who has often served as an expert on business valuation and damages issues, *see* Ex. E, but she never has been retained as a liability expert, let alone to opine whether "there was or was not a statistical basis to conclude that some employment action or set of employment actions was discriminatory." Meer Depo., Ex. D, at 15:8-14. *See also id.* at 13:17-24. She has never "run a multiple regression analysis directed towards determining whether there was or was not statistical evidence of discrimination in an employment context." *Id.* at 54:6-10. Ms. Meer concedes that she is "not an expert in the rules of statistical analysis," *id.* at 37:14-22, but claims only experienced in how such analyses are applied in the fields she is familiar with, primarily financial modelling. Moreover, even if Ms. Meer were an expert in statistical analysis of financial issues, that would not qualify her to testify regarding use of statistical analysis in proving or disproving racially disparate treatment. For example, a court in Eastern District of Michigan has noted:

> Dr. Van Wingen has no educational or professional background or experience in employment statistics. Instead, they imply that his background in other areas of statistics qualifies him to render a general opinion in any area, or at least in employment statistics. However, Plaintiffs do not present any evidence or authority which supports this proposition.

*King v. Enter. Rent-A-Car Co.*, 231 F.R.D. 255, 267 (E.D. Mich. 2004). Likewise, another district court has held:

> Although Dr. Peterman could be considered qualified as an expert in statistical analysis of geographic data, the Court finds that he lacks sufficient knowledge through training, education, or experience to be considered qualified to offer an expert opinion regarding matched pair data analysis and/or whether the EHOC tests provide evidence of racial steering.

*Metro. St. Louis Equal Hous. Opportunity Council v. Gordon A. Gundaker Real Estate Co.*, 130 F. Supp. 2d 1074, 1088 (E.D. Mo. 2001).

In order to testify as an expert regarding statistical evidence of discrimination, a person must have either directly relevant academic credentials or directly relevant practical experience. Ms. Meer has neither.

### C.   Ms. Meer's Testimony is not Reliable.

As an alternative basis for excluding Ms. Meer's testimony regarding the supposed existence of a rule regarding the minimum number of observations necessary for a standard means test, it is unreliable. Indeed, her assertion of the existence of the rule is entirely conclusory, and she was unable in her deposition to identify a source for it. Although she acknowledged there probably were exceptions, she was unable to say more than that:

> Q. As you sit here today, can you tell me what specific source you rely on in concluding that a standard means test should not be performed without at least 30 data points in each set?
>
> A. I cannot tell you a specific empirical source, but I will provide that to you after my deposition. That would not have been a figure I would have inserted without third-party corroborative information or basis therefor.
>
> Q. Do you know if that's a universally or close to universally held view among professional 1 statisticians?
>
> A. To the extent I use the word "normally," I'm sure there are exceptions, but it's probably what the authoritative literature indicates in general terms.

7

Meer Depo., Ex. D, at 36:15-37. This alone is sufficient grounds to exclude the testimony. *Cf. King,* 231 F.R.D. at 267 ("his explanation of his methodologies and rationale are largely conclusory, with little or no explanation of the scientific or other authority on which he relies").

Defendants may note that Ms. Meer relied on Jessica Rosh, another individual in her firm, for this conclusion. *See* Meer Depo., Ex. D, at 38:4-21. That fact will not aid them, because it appears Ms. Meer merely acted as a conduit for Ms. Rosh's conclusion, rather than exercising her own judgment based on her own knowledge of governing statistical principles:

> Q. In connection with this engagement, did you personally go and research what the statistical literature says about minimum sample sizes for standard means tests or did someone else in your firm do that?
>
> A. Someone else in my firm did that.
>
> . . . Q. And did she give you a conclusion as to that or did she give you a stack of literature and say, Here, read this?
>
> A. Based on her research, that was the figure. . . .

*Id.* at 38:4-21.

While an expert is permitted to rely on others for limited purposes, he "must in the end be giving his own opinion;" if instead he is merely serving as a "conduit" for the opinion of another, his testimony must be excluded. *Malletier*, 525 F. Supp. 2d at 664; *see also Faulkner v. Arista Records LLC*, No. 07 CIV. 2318 LAP, 2014 WL 4547824, at *18 (S.D.N.Y. Sept. 15, 2014) (citing several "conduit" cases). In *Malletier*, the court excluded the testimony of a financial expert to the extent it was based on a statistical analysis conducted by an economist, because the financial expert did not and was not qualified to

8

meaningfully evaluate that analysis. *Id.* ("With respect to the regression analysis, Anson was not an expert but rather a 'mouthpiece.' Louis Vuitton thus produced the wrong expert to prove the reliability of the regression analysis."). Likewise, whatever Ms. Rosh's statistical qualifications may be, they cannot serve to render Ms. Meer's statistical testimony reliable and admissible.

## II.     MS. MEER'S OPINIONS REGARDING THE APPROPRIATE DISCOUNT RATE ARE CONTRARY TO SETTLED LAW

### A.     Relevant Testimony.

Dr. Pacey discounted all lost earnings projected to be suffered after a hypothetical trial date to the date of trial, using a net discount rate of 2.5%.[2] *See, e.g.*, Pacey Report, Ex. A, at p. 11. She explained the basis for her method of discounting and the rate she used at length in the appendixes to her report. *See id.* at Appendix C pp. 2-14. As explained therein, conceptually, the net discount rate is simply the difference between an expected rate of return on safe investments and the expected rate of wage grown. This could be calculated by projecting future investment returns and future wage growth, and netting the two. *Id.* at Appendix C p. 5. Or, rather than separately projecting wage and investment rates, one could focus directly on the expected difference between them. *Id.* at Appendix C p. 6. Dr. Pacey expressly adopts this latter method, noting "an extremely high correlation between aggregate earnings growth and investment yields." *Id.* As support for an assumed difference, and therefore discount rate, of 2.5%, Dr. Pacey includes a table summarizing historical data. It shows, for example, that over the

---

[2] Dr. Pacey prepared her report before a date had been set for trial. She is in the process of updating her report, including to reflect the actual trial date.

preceding 20 years, the average difference of 2.1% between earnings growth and interest on 10 year United States Treasury securities, i*d.* at Appendix C p. 14, supporting her assertion that the 2.5% rate she used "may be overly conservative," *id.* at p. 11.

Ms. Meer altogether rejects Dr. Pacey's approach.  She opines that the discount rate must be increased to reflect the risk that the lost wages claimed by Plaintiffs were not actually lost as a result of Defendants' illegal actions.  Basically, her opinion is that because it is not 100% certain that Plaintiffs would have received the income but-for Defendants' actions, that uncertainty must be "built in" to the discount rate.  *See* Meer Depo., Ex. D, at 94:15-23 (it's her "view that even if the finder of fact concludes that more likely than not, plaintiff X would have been employed at Matheson for three more years but for some discriminatory act, they still should be discounting the front-pay damages awarded the plaintiff X because of the possibility that in fact he would have left Matheson in less than three years"); *see also id.* at 81:17-82:5, 92:3-25, 98:21-100:16.  Further, in Ms. Meer's opinion, because uncertainty exists even as to back pay, it too must be discounted, with both back pay and front pay discounted to the date of loss, rather than to the date of trial.  *Id.* at 96:7-16 (it's her view that "if the jury decides that back-pay damages more likely than not have been incurred, still those damages need to be discounted for the possibility they were not incurred").

### B.      Ms. Meer's Opinions Regarding the Proper Discount Rate Are Contrary to Settled Law, and Therefore, Neither Relevant Nor Helpful.

The purpose of discounting an award of future damages to present value is simply to reflect the time-value of money.  Hence, discount rates properly are based on the rate of return the plaintiff can be expected safely to earn on the damages awarded, from the date of the award until the date the plaintiff would have receive the income.  Indeed, the model set of jury instructions favored by this Court provide:

> You must also reduce any award to its present value by considering the interest plaintiff [name] could earn on the amount of the award if plaintiff had made a relatively risk-free investment. The reason you must make this reduction is because an award of an amount representing future loss of earnings is more valuable to plaintiff if plaintiff receives it today than if plaintiff received it in the future, . . . because plaintiff can earn interest on it for the period of time between the date of the award and the date plaintiff would have earned the money. Thus, you should adjust the amount of any award for future loss of earnings by the amount of interest plaintiff [name] can earn on that amount in the future.

*Fed. Jury Prac. & Instructions*, § 171.92. *See also Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 537, 103 S.Ct. 2541, 2550 (1983) ("The discount rate should be based on the rate of interest that would be earned on the best and safest investments.") (internal citation marks omitted).

However, where the amount of front pay is calculated based on the current rate of earnings, consideration also must be given to the fact that wages tend to increase over time, due to inflation and other factors.  Hence, the projected rate of future wage growth must netted against the projected rate of investment returns, in order to arrive at the proper net discount rate:

> If full account is taken of the individual and societal factors (excepting price inflation) that can be expected to have resulted in wage increases, then all

11

> that should be set off against the market interest rate is an estimate of future price inflation. This would result in one of the "real interest rate" approaches described above.

*Jones & Laughlin Steel,* 462 U.S. at 548, 103 S.Ct. at 2556.

As Dr. Pacey described, this may be done in one of two ways. First, the future investment rate of return and rate of wage growth may be projected, and the former reduced by the latter, for each year of the front pay period. However, both of the rate of investment return and the rate of wage growth are variable, and there is no need to rely on specific forecasts of them. As Dr. Pacey explained, there has been greater consistency in the relationship between the two rates. As a result, it is common to instead recognize historical and current data regarding the amount by which investment returns exceed wage growth, and project the difference forward as a net discount rate to be applied to the front pay period. Courts, and in particular the Tenth Circuit, have approved this approach:

> Some courts have sought to avoid the complexity of such computations by assuming that investment interest and inflation rates will normally have a fairly fixed relationship to each other so that a net discount rate may be used that merely reflects the rate by which investment interest normally will exceed inflation. This is also referred to as the real rate of return that an investor receives.

*Hull by Hull v. U.S.,* 971 F.2d 1499, 1511 (10th Cir. 1992).

That is precisely the method which Dr. Pacey utilized at arriving in her net discount rate of 2.5%. Moreover, "most courts assume that the net discount rate will be in the range of one to three percent." *Id., citing Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30, 39–40 (2d Cir.1980) (fixing discount rate at two percent unless litigants offer evidence to the contrary), *cert. denied*, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351

12

(1981); *Jones & Laughlin Steel*, 462 U.S. at 548–49, 103 S.Ct. at 2556 (holding in a Longshoremen's and Harbor Workers' Compensation Act case that a trial court should not be reversed "if it adopts a rate between 1 and 3% and explains its choice"); *Trevino v. United States*, 804 F.2d 1512, 1519 (9th Cir.1986) (extending *Jones & Laughlin Steel* to another type of claim).

In essence, Ms. Meer's opinion is that the Supreme Court, Tenth Circuit, and other cited decisions are incorrect, and that a discount rate to be applied to lost earnings should not merely reflect the net of investment returns over wage growth. Rather, she opines, the discount rate should reflect the possibility that the damages being awarded are being awarded in error, because other events would have prevented the plaintiff receiving the lost income, even had it not been for the defendant's discrimination. Whatever support this opinion may have in financial literature is beside the point, because that is not the purpose of discounting legal damages. Juries are instructed to award all damages that are sufficiently certain. They are not instructed, for example, that if they determine an item of damages is only 90% certain to have occurred, then they should reduce it by 10%, but that is essentially what Ms. Meer is seeking to accomplish through the discount rate.

Moreover, it is noteworthy that even Ms. Meer acknowledged that the discount rate is not the best way to account for the "risk factors" she discusses:

> And better yet, I'll be honest, rather than dumping a bunch of risk factors for lack of predictability or consistency in work history, the much, much, much better way to have approached this would have been to customize for each individual plaintiff a front-pay period, because we don't like using a discount rate as a trash can for risk when one can much more appropriately and much more specifically add sanity to a calculation.

13

Meer Depo., Ex. D, at 102:16-24.  Plaintiffs do not seek to prevent Defendants from making the "much better" argument that Plaintiffs are seeking front pay damages for too long of a period, given the "risk factors" Ms. Meer identifies.  Rather, they are seeking to prohibit Ms. Meer from offering irrelevant testimony that uses the "discount rate as a trash can for risk," when there is a "more appropriate" way to consider that risk.

### C. Ms. Meer's Opinion That Both Back Pay and Front Pay Should be Discounted to the Date of Adverse Action Are Contrary to Settled Law, and Therefore, Neither Relevant Nor Helpful to the Trier of Fact.

Because the purpose of discounting damages is to reflect the time-value of money, discounting properly is done to the date of trial, and there is no reason to discount back pay awards:  "Concerning lost past wages, no discounting should be applied at all. It is merely necessary to adjust separately each year's installment to account for the delay experienced before trial."  *Deakle v. John E. Graham & Sons*, 756 F.2d 821, 834 (11th Cir. 1985).  *Cf. Hull*, 971 F.2d at 1511 ("remand[ing] for the district court to make appropriate findings of fact explaining its method of calculating present value *for all awards for future damages*") (emphasis added).

While conceptually Ms. Meer is correct that back pay and front pay could be discounted back to the date of loss, it would then be necessary to give Plaintiffs the benefit of the same assumed rate of return as interest back to the date of trial, which would result in a wash:

> As for lost future wages, the clerk of the court need only discount the thirty-six annual installments to the date of trial before totaling the award. The clerk could discount back to the date of Deakle's injuries, total the award, and then add back in the "interest" not earned in the years before trial. But this would entail unnecessary effort, since the latter adjustment would employ the same rate as the discount rate that had already been applied to

14

each installment for the same period.

*Deakle*, 756 F.2d at 834.  *See also Complaint of Connecticut Nat. Bk.*, 928 F.2d 39, 42 (2d Cir. 1991) (if "done properly," the method advocated here by Ms. Meer would lead to the "identical result").[3]

## CONCLUSION

Ms. Meer's testimony regarding Dr. Pacey's statistical analyses of the December 2010 furlough should be excluded, because it is unreliable, primarily for the reason that Ms. Meer is not qualified as an expert on the subject.  Ms. Meer's testimony regarding discounting of Plaintiffs' back pay and front pay damages should be excluded, because her views are contrary to settled law in this area, and therefore neither relevant nor helpful. More generally, "trial should not be converted into a graduate seminar on economic forecasting."  *Jones & Laughlin Steel* Corp., 462 U.S. at 548, 103 S.Ct. at 2556.  Ms. Meer derides as too simplistic Dr. Pacey's methods, both of arriving at a net discount rate and in discounting only to the date of trial, but those are the very methods which have been routinely applied and approved by the courts.  Allowing Ms. Meer's testimony could only confuse, rather than aid, the jury.

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order prohibiting Ms. Meer from testifying regarding:  (1) matters of statistical analysis, including Dr. Pacey's statistical analysis of the December 2010 furlough; and (2) matters related to discounting of Plaintiffs' lost income (back pay and front pay) damages.

---

[3] The reason Ms. Meer would get a different result is that she would do it improperly, for the reasons described in the preceding section.

Respectfully submitted this 12th day of December, 2014.

_s/ Brian T. Moore_
Brian T. Moore
Jester Gibson & Moore, LLP
1999 Broadway
Suite 3225
Denver, CO 80202
Telephone: 303.377.7888

Lynn D. Feiger
Justin M. Plaskov
Lohf Shaiman Jacobs Hyman & Feiger PC
950 S. Cherry Street
Suite 900
Denver, CO 80246
Telephone:  303.753.9000

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of December, 2014, a true and correct copy of the foregoing **PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY** was filed with the Clerk of the United States District Court for the District of Colorado using the CM/ECF system, and served upon the following:

Stacey A. Campbell, Esq.
Daniel M. Combs, Esq.
Kalisha Salome Chorba, Esq.
Littler Mendelson, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO 80202
stcampbell@littler.com
dcombs@littler.com
kchorba@littler.com

Mark Berumen, Esq.
Berumen Law Firm, P.C.
1450 S. Havana Street, Suite 412
Aurora, CO  80012
markberumen@berumenlaw.com

                                                           _s/ Brian T. Moore_____